Gmail                                                                    Jeremy Jackson <jjackson@bower-law.com>

## RE: LR-1001938 | TCPA Attorney Letter | Friel
1 message

**omar sukhraj** <trustpoint@mytpi.us>                                                    Fri, Aug 29, 2025 at 9:12 AM
To: "jjackson@bower-law.com" <jjackson@bower-law.com>

Good Morning Sir,

I was advised yesterday 8.27.2025 to send this email to you in regards to the call that was made to your client.

Good afternoon Ma'am,

A couple of weeks ago, I was made aware of this matter and promptly sent several emails to my Upline regarding it. Thank you for bringing this matter to my attention. I understand your concerns regarding the letter of demand you received related to a phone call placed to an individual listed on the National Do Not Call (DNC) Registry.

Please be assured that I take this situation very seriously. The call in question was made in error and was not intentional. I sincerely apologize for any inconvenience this has caused. As soon as I became aware of the issue, I began reviewing the process that led to the call to ensure full compliance with all telemarketing and DNC regulations going forward.

Email that was sent explaining to my upline:

# Incident Statement: Vendor-Supplied Telemarketing Leads

## Background

The leads in question were obtained from a vendor located overseas, with whom I first made contact through LinkedIn. Before taking any steps forward, I made it a point to ask the vendor directly about compliance with U.S. telemarketing laws, including the requirements of the National Do Not Call (DNC) Registry.

The vendor assured me of two things:

1. That all leads were obtained lawfully with proper consumer consent.
2. That the list had been scrubbed against the National DNC Registry prior to delivery.

These assurances were central to my decision to proceed. Relying in good faith on the vendor's representations, I agreed to test a small batch of free promotional leads before entering into any purchase arrangement.

## Lead Handling Process

- The vendor uploaded the test leads into a dialer operated by a company they recommended.
- The dialer initiated outbound calls to these leads.
- When a consumer answered and showed interest, the vendor's initiated a three-way transfer.
- At that point, I was brought into the call to verify the consumer and continue the conversation.

## Actual Handing of the call after transfer

According to my knowledge, this customer was contacted once and then transferred to me. I spent approximately 10 minutes on the call verifying his information and ensuring all details were accurate. During our conversation, the customer acknowledged my presence on the line and engaged in a discussion about final expense insurance. At no point did he mention being on the Do Not Call (DNC) list, nor did he request that calls to his number be stopped. Also during the verification of his information Name, Address, DOB, Beneficiary, SSN and bank account information he never once implied he is on the DNC list or was not supposed to be called.

At the close of the call, I provided my name, my company, and my direct number should he encounter any issues. I did not call the customer again after the sale, nor did I receive any calls from him. In fact, he indicated that he did not need to call me back, explaining that the individuals who contacted him prior to the transfer had already collected the same information, and if he had any issues, he would reach out to them since they made the initial call.

## Discovery of Potential Non-Compliance

It later came to my attention that some individuals on the list may have been registered on the DNC Registry. This has resulted in certain parties initiating legal action related to being contacted.

As soon as I became aware of this, I immediately reached out to the vendor and requested documentation to confirm the DNC scrubbing process and the compliance status of the leads.

## Vendor and Dialer Responses

- The **vendor** claimed that scrubbing was conducted through software but stated that the system does not generate or retain historical scrub reports.
- The **AI dialer company**, recommended by the vendor, was also contacted for call records and timelines. They informed me that they had since switched platforms and no longer had access to those records.
- When I followed up with the vendor, I attempted to access older correspondence. Unfortunately, those prior communications appeared to have been deleted, and the vendor has since stopped responding altogether. This lack of cooperation has prevented me from recovering emails, chat records, and other materials previously provided, and has materially hindered my ability to verify their compliance claims.

As a result, no documentation was ever produced by either the vendor or the dialer company to substantiate the assurances initially given.

## Due Diligence Steps Taken Prior to Use

Before incorporating any leads into outreach, I took the following good-faith steps:

- I obtained explicit verbal confirmation from the vendor regarding DNC compliance.
- The vendor represented that all scrubbing procedures had been performed.
- I made it clear that these assurances were relied upon for compliance purposes.

## Corrective Actions Implemented

In light of the vendor's failure to provide documentation, I have taken immediate corrective measures, including:

1. **Vendor Vetting** – Only engaging vendors who provide verifiable written compliance documentation.
2. **Lead Data Requirements** – Requiring each lead to include name, phone number, opt-in date, and source.
3. **Independent Scrubbing** – Conducting all scrubbing in-house against national and internal DNC lists.
4. **System Controls** – Uploading validated leads only into secure CRM/dialer systems with source tracking.
5. **Call Handling** – Ensuring all live calls are managed by trained agents using compliance-approved scripts.
6. **Recording & Retention** – Recording and securely storing all calls on our new system for audit and legal purposes.

## Lessons Learned

This incident has reinforced several important lessons:

- **Verbal assurances are not enough.** Written, verifiable documentation is now a mandatory requirement for any vendor engagement.
- **Independent verification is essential.** Vendor scrubbing cannot be solely relied upon; all leads must undergo internal compliance checks.
- **Record retention is critical.** Vendors and dialer partners must demonstrate the ability to produce scrub logs, call records, and compliance reports.
- **"Free" or promotional leads carry equal compliance risks.** All leads, regardless of cost, must undergo the same rigorous vetting and verification.
- **Ongoing oversight protects the business.** Stronger contracts, regular audits, and reliable recordkeeping are key to reducing compliance risks.

Our company takes compliance with telemarketing and consumer protection laws extremely seriously. Every action taken in this matter was based on good-faith reliance upon the vendor's assurances at the time. Unfortunately, the vendor failed to produce any supporting evidence of compliance.

I want to make it clear that at every stage of this process, I acted with honesty, transparency, and good-faith reliance on the information provided to me. I specifically asked the vendor about compliance with U.S. telemarketing laws, including the DNC Registry, before moving forward. The vendor gave explicit assurances that the leads were compliant, and I relied on those assurances in making my decision to test the leads.

At no point did I knowingly or intentionally engage in any practice that would violate consumer protection or telemarketing laws. As soon as I became aware that some of the leads may not have been compliant, I took immediate steps to investigate, request documentation, and address the issue. I have since implemented stronger safeguards to ensure that this type of situation does not occur again.

I understand the importance of compliance and consumer trust in this industry. My actions were based solely on a good-faith belief that the vendor was providing lawful, opted-in leads, and my priority has always been to protect both the company I represent and the consumers we contact.

Moving forward, stricter vendor controls, mandatory written documentation, and independent verification procedures will ensure greater protection for our company, our agents, and consumers, while upholding full compliance with all applicable laws and regulations.

Suresh Sukhraj- Agent/Owner

TrustPoint Insurance Corp

Email: trustpoint@mytpi.us

Phone: 772-303-1059

Fax: 772-207-0089

Website: mytpi.us


**From:** Michelle Hilliker <mhilliker@aatx.com>
**Sent:** Thursday, August 21, 2025 11:18 AM
**To:** omar sukhraj <trustpoint@mytpi.us>
**Subject:** LR-1001938 | TCPA Attorney Letter | Friel


Good Morning,


Please work with your lead vendor and reply to attached email. You should provide opt in from lead vendor.


Thank you




### Michelle Hilliker

Assistant Vice President

Marketing and Sales


**P**: 254-231-5584

**E**: mhilliker@aatx.com


www.americanamicable.com


**CONFIDENTIALITY NOTICE:** This communication, including any attachments, is intended only for the use of the individual or entity to which it is addressed and contains information which may be confidential and/or privileged.  If you are not the intended recipient, any disclosure, copying, distribution, or use of the contents of this information is strictly prohibited.  If you have received this communication in error, notify the sender immediately, delete the communication and destroy all copies.  Thank you for your compliance.

Suresh Sukhraj- Agent/Owner

TrustPoint Insurance Corp

Email: trustpoint@mytpi.us

Phone: 772-303-1059

Fax: 772-207-0089

Website: mytpi.us

**2 attachments**



**Compliance.PNG**
34K





**Leads.PNG**
23K